AO 106 (Rev. 04/10) Application for a Search Warrant                                                                 USAO# 2012R01085

# UNITED STATES DISTRICT COURT
### for the
### Western District of Washington

FILED _____ LODGED
_____ RECEIVED

MAR 1 3 2015

CLERK U.S. DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON AT TACOMA
BY _____ DEPUTY

| | |
|---|---|
| In the Matter of the Search of<br>*(Briefly describe the property to be searched<br>or identify the person by name and address)*<br>Premises located at: 2521 Fremont Street,<br>Tacoma, WA 98406 | )<br>)<br>)<br>)<br>)<br>) |

Case No.

MJ15- 5041

## APPLICATION FOR A SEARCH WARRANT

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property *(identify the person or describe the property to be searched and give its location)*:

See Attachment A, attached hereto and incorporated herein by reference.

located in the _____Western_____ District of _____Washington_____ , there is now concealed *(identify the person or describe the property to be seized)*:

See Attachment B, attached hereto and incorporated herein by reference.

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more)*:

- ☑ evidence of a crime;
- ☑ contraband, fruits of crime, or other items illegally possessed;
- ☐ property designed for use, intended for use, or used in committing a crime;
- ☐ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:

| Code Section | Offense Description |
|---|---|
| 26 U.S.C. § 7206(1) | False Tax Filings |

The application is based on these facts:

See Affidavit of Special Agent Aaron Hopper, attached hereto and incorporated herein by reference.

- ☑ Continued on the attached sheet.
- ☐ Delayed notice of _____ days (give exact ending date if more than 30 days: _____ ) is requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

*Aaron Hopper*
*Applicant's signature*

Aaron Hopper, Special Agent, IRS
*Printed name and title*

Sworn to before me and signed in my presence.

Date: 3/13/15

*J. Richard Creatura*
*Judge's signature*

City and state: Tacoma, Washington

J. Richard Creatura , U.S. Magistrate Judge
*Printed name and title*

# **AFFIDAVIT**

STATE OF WASHINGTON    )
                                )    ss
COUNTY OF PIERCE         )

    I, Aaron Hopper, a Special Agent with the Criminal Division of the Internal Revenue Service, being first duly sworn, depose and state as follows:

## I.    INTRODUCTION

    1.    I submit this affidavit in support of a warrant to search the residence of Troy X. Kelley located in Tacoma, Washington, for evidence, instrumentalities, and fruits of the offense of False Tax Filing, in violation of Title 26, United States Code, Section 7206(1), for the tax years 2011 and 2012.  I have reason to believe that Kelley knowingly and willfully declared tens of thousands of dollars in false business expenses in 2011 and 2012 in connection with a scheme to fraudulently reduce his tax obligations.

    2.    From approximately 2002 through 2008, Kelley owned and operated a business that tracked, on behalf of escrow companies, the recording of reconveyance documents in residential real estate transactions.  In 2008, law suits were filed in Washington State on behalf of escrow customers alleging, among other things, that escrow companies knowingly and fraudulently charged unnecessary reconveyance fees.  The escrow companies, in turn, revealed that in some cases they had out-sourced the monitoring of reconveyances and turned over the administration of reconveyance fees to third-party service providers such as Kelley's business.  One escrow company explicitly accused Kelley of failing to make good on promises to return to the escrow customers the unused portions of their fees.

    3.    In about June 2008, as the suits were lodged, Kelley ceased operating his reconveyance tracking business in Washington State.  That same month, Kelley, through a series of transactions, consolidated more than $3 million dollars in reconveyance fees

SW Affidavit- 1

1  that he had maintained in various accounts and transferred the money into one account

2  held in the name of a newly-formed entity, but controlled by Kelley.  Moreover, Kelley

3  did not declare the millions of dollars of fees he took as income to the IRS.

4      4.    By 2011, the reconveyance-fee lawsuits that implicated Kelley had been all

5  dismissed or settled.  As of June 2011, after paying a substantial settlement to one of his

6  escrow company clients, Kelley continued to control more than $2 million of the

7  reconveyance fees he had originally amassed in 2008.  However, Kelley still had not

8  declared any of the sums he held as income to the IRS.  At this point, rather than declare

9  and pay tax on the entire amount, Kelley embarked on a scheme to fraudulently reduce

10  his tax burden.  Beginning in about June 2011 and continuing through 2012, Kelley paid

11  himself $245,000 per year from the pool of more than $2 million through a wholly owned

12  S corporation, Blackstone International, Inc. (hereinafter, "Blackstone").  In the relevant

13  federal income tax filings for each of those years, Kelley declared that Blackstone was in

14  the business of providing "document tracking" services, and listed the $245,000

15  payments as the only major source of income earned by Blackstone.  Kelley then further

16  offset each year's income with tens of thousands of dollars of purported business

17  expenses.

18      5.    Blackstone's tax filings for the tax years 2011 and 2012 (which were filed

19  with the IRS in 2012 and 2013, respectively) were knowingly and materially false.  As

20  detailed below, the investigation to date indicates that Kelley did not conduct any

21  document-tracking business through Blackstone in 2011 and 2012 to generate the

22  $245,000 in income, and, more importantly, the purported business expenses he claimed

23  to reduce his tax.  The business address listed for Blackstone in each of the relevant tax

24  filings is the personal residence of Kelley.  Each of Blackstone's tax returns is signed as

25  having been prepared by Kelley.  For these reasons, and for reasons detailed below, I

26  believe there is probable cause to believe that evidence, fruits, and instrumentalities of

27  the offense of False Tax Filing for the tax years 2011 and 2012 may be found at Kelley's

28  residence.

SW Affidavit- 2

## II.   EXPERIENCE OF AGENT.

6.      I am a Special Agent with the Internal Revenue Service, Criminal Investigation (IRS-CI). I have been so employed since September, 2008. My official duties and responsibilities include the investigation of alleged criminal violations of the Internal Revenue Code and related financial offenses. I have conducted investigations of suspected tax fraud including the filing of false tax returns. I have also participated in the execution of search warrants obtained by myself and other special agents of the IRS-CI.

7.      I received a Bachelor's of Science degree in Accounting from City University. I am a Certified Public Accountant, licensed in the State of Washington since 2005. I have successfully completed the Criminal Investigator Training Program and the Special Agent Investigative Techniques Program, both of which were held at the Federal Law Enforcement Training Center in Glynco, Georgia. My training included courses in law enforcement techniques, federal criminal statutes, conducting criminal investigations, and the execution of search warrants. I also received training in financial investigation techniques and legal principles, which emphasized the investigation of criminal offenses under Titles 26, 18, and 31 of the United States Code. Before my current position with IRS-CI, I was employed as a Revenue Agent for the IRS for approximately three years, primarily performing civil examinations of small businesses and self-employed individuals. As a Revenue Agent I received specialized training in personal, partnership, and corporate income tax, as specified in the Internal Revenue Code. Prior to working for the IRS, I was employed as a Revenue Auditor by the Washington State Department of Revenue, conducting examinations of businesses' combined excise tax returns.

8.      The facts set forth in this Affidavit are based on information obtained by me and others during this investigation from a variety of sources, including, but not limited to: (a) witness interviews; (b) business records and other documents obtained from various entities; (c) federal tax return information; and (d) publicly available documents.

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

1     9.     Because this Affidavit is submitted for the limited purpose of establishing

2 probable cause in support of the application for a search warrant, it does not set forth

3 each and every fact that I or others have learned during the course of this investigation.  I

4 have set forth only the facts that I believe are necessary to the determination of probable

5 cause to believe that evidence, fruits and instrumentalities of violations of Title 26,

6 United States Code, Section 7206(1) (False Tax Filing) will be found within Kelley's

7 residence.

8                 **III.     LOCATION TO BE SEARCHED.**

9     10.     I make this affidavit in support of an application for a warrant to search the

10 residence of Troy X. Kelley, located at 2521 Fremont Street, Tacoma, Washington,

11 98406, further described in Attachment A, and to seize the items listed in Attachment B,

12 which attachments are appended to this affidavit and incorporated herein by reference for

13 evidence, fruits, and instrumentalities of violations of Title 26, United States Code,

14 Section 7206(1) (False Tax Filing).

15                 **IV.     RELEVANT LEGAL PROVISIONS.**

16     11.     Title 26, United States Code, Section 7206(1) provides that anyone who

17 "willfully makes and subscribes any return, statement, or other document, which contains

18 or is verified by a written declaration that it is made under the penalties of perjury, and

19 which he does not believe to be true and correct as to every material matter . . ." shall be

20 punished pursuant to the statute.  The elements of the offense are as follows:

21     First, the defendant made and subscribed a return, statement, or other document

22 which was false as to a material matter;

23     Second, the return, statement, or other document contained a written declaration

24 that it was made under the penalties of perjury;

25     Third, the defendant did not believe the return, statement, or other document to be

26 true and correct as to every material matter; and

27     Fourth, the defendant falsely subscribed to the return, statement, or other

28 document willfully, with the specific intent to violate the law.

SW Affidavit- 4

1

## V.    INVESTIGATION

2 **A.    Background.**

3     *1.    Troy X. Kelley*

4     12.    Troy Kelley is the current Washington State Auditor and a former member

5 of the Washington State House of Representatives.  Kelley holds a J.D. and M.B.A. and

6 is a licensed attorney in Washington State.  During law school, Kelley worked for the

7 United States Attorney's Office in the Western District of New York.  After graduating

8 from law school and business school, Kelley worked as an attorney for United States

9 Securities and Exchange Commission and then as a private attorney, concentrating on

10 real estate title matters.  Thereafter, Kelley worked for many years as counsel and general

11 counsel for First American Title Company in California, eventually becoming president

12 of the company's tax exchange division (First American Exchange Corporation, a

13 qualified intermediary for 1031 deferred tax exchanges of like-kind investment property).

14 In about 2000, Kelley moved to Washington State and then opened his own business.

15 From about 2002 through 2008, Kelley operated United National, LLC, which did

16 business under the name Post Closing Department (hereafter "Post Closing Department"

17 or "PCD").  Kelley was first elected to the Washington State House of Representatives in

18 2006 and served three terms.  In 2012, Kelley was elected Washington State Auditor.

19     13.    Kelley's experience and background show that he has a sophisticated

20 understanding of tax matters.  Kelley is a trained attorney and has worked specifically

21 with tax issues as they pertained to real estate dealings.  A review of Kelley's federal tax

22 filings indicates that he self-prepared most of his businesses' returns and personal returns

23 for many years.  Finally, during a sworn deposition taken on August 2, 2010, in

24 connection with a civil lawsuit regarding reconveyance fees, Kelley acknowledged that

25 he had taken tax courses, that he understood tax, and had even taught tax.

26

27

28

SW Affidavit- 5

1       2.      *Blackstone International, Inc.*

2       14.     Pursuant to records from the Nevada Secretary of State, Blackstone

3   International, Inc. (hereinafter "Blackstone") was formed on or about October 26, 2000.

4   The Articles of Incorporation list Kelley as the sole officer and director of Blackstone.

5       15.     Kelley remains the sole owner of Blackstone.  I have reviewed federal

6   income tax returns for Blackstone and Kelley for the tax years 2006 through 2013.

7   According to the tax returns, 100 percent of Blackstone's declared flow-through income

8   flows through to Kelley's personal returns in those tax years.  I also have reviewed

9   certain financial disclosure reports filed by Kelley with the Washington State Public

10  Disclosure Commission (hereinafter "PDC").  As a candidate and an elected state official

11  since 2005, Kelley is required pursuant to Washington State law to annually file reports

12  with the PDC that disclose, among other things, occupation, ownership interests in

13  business entities, and sources of income.  These mandated reports are called Personal

14  Financial Affairs Statements or "F-1 Reports."  The F-1 Reports are signed and submitted

15  by the candidate/official under penalty of perjury and are made publicly available through

16  the PDC.  Beginning with the first F-1 Report filed in 2005 and continuing through

17  calendar year 2013, Kelley declared he owned 100 percent of Blackstone.[1]

18      16.     I believe Kelley has presented conflicting information about the true

19  purpose of Blackstone and whether the entity itself has been used to conduct any active

20  trade or business.  According to Kelley's public F-1 Reports, Blackstone appears to be a

21  passive entity, i.e. not used to conduct an active business.  Kelley has consistently

22  described the purpose of Blackstone in the F-1 Reports as a "holding company" or a

23  "company holding investments."

24      17.     Blackstone further lacks other public indicia of a business that derives

25  income from actively providing goods and services.  Blackstone's tax returns for the tax

26  ————————————————

27  [1]  According to the PDC, full detailed F-1 Reports are filed by candidates and officials generally once every four
    years.  In the interim years, the candidate or official may file a shortened summary form that details only the
28  information that had changed from the last full report.  Kelley has filed full detailed F-1 Reports for the 12 months
    preceding approximately December 6, 2005, calendar years 2008, and 2012, with minor or no changes reported in
    the interim years.

SW Affidavit- 6

1   years 2006 through 2013, and Kelley's F-1 Reports all list Blackstone's business address

2   as Kelley's residence in Tacoma, Washington.  However, to date, I have found no

3   evidence that Blackstone had ever obtained a Washington State business license or

4   reported any revenues to the Washington State Department of Revenue.

5       18.     While the F-1 Reports indicate that Blackstone may be a passive "holding

6   company," Blackstone's federal tax returns present a very different picture of Blackstone.

7   I have reviewed Blackstone's Forms 1120S "U.S. Income Tax Return for an S

8   Corporation," filed for the tax years 2006 through 2013.  As noted above, because Kelley

9   owns 100% of Blackstone, the total ordinary business income (or loss) declared on

10  Blackstone's Forms 1120S eventually flows through to Kelley's personal tax returns and

11  contributes to his personal income.  These Blackstone corporate returns, in contrast to the

12  F-1 Reports, depicted Blackstone as an active business engaged in providing services or

13  products, and deriving substantial income and incurring substantial business expenses as

14  a result.  First, rather than describing Blackstone as a "holding company," for the tax

15  years 2006 through 2009, the returns identified Blackstone's business activity as

16  "Information" or "Information Services," and declared that Blackstone's product or

17  service included "Recorded Documents."  For the tax years 2010 through 2012, the

18  description of Blackstone's purpose changed slightly.  In those tax years, Kelley

19  continued to declare that Blackstone's business activity consisted of "Information

20  Services," but the product or service offered was changed to "Document Tracking."  For

21  the tax year 2013, Kelley indicated that Blackstone's business activity consisted of

22  "Information Services," but he did not declare any specific product or service.

23      19.     Second, in many of the tax years from 2006 through 2012, Blackstone

24  reported hundreds of thousands of dollars of gross profits as a result of its business

25  activities – independent of income earned simply as a result of its ownership interests in

26  other entities – and deducted tens of thousands of dollars of purported expenses incurred

27  in the course of conducting this business.  The types of business expenditures deducted

28  during these years included depreciation for vehicles that were purportedly used 100%

SW Affidavit- 7

for Blackstone's business, attendance at conferences and education, business travel, communication costs, and thousands of dollars of "sales expenses."  The following is a chart summarizing for each tax year reviewed, the amounts of gross receipts or profits Kelley declared was earned by Blackstone and the amount of deductible business expenses incurred in that year:

| Tax Year | Blackstone's Gross Receipts or Profit | Business Expenses |
|----------|--------------------------------------|-------------------|
| 2006 | $295,006 | $65,467 |
| 2007 | $158,742 | $51,447 |
| 2008 | $153,395 | $23,765 |
| 2009 | $0 | $33,291 |
| 2010 | $0 | $30,551 |
| 2011 | $245,000 | $66,147 |
| 2012 | $245,000 | $60,425 |

20.     As further detailed below, there is probable cause to believe that at least with respect to the tax years 2011 and 2012, Blackstone was not actively engaged in the business of providing "document tracking" services and, therefore, the business expenses used to reduce the tax liability in those years were fraudulent.

3.     *United National LLC, dba Post Closing Department*

21.     The Washington Secretary of State records show that United National LLC (hereinafter "United National") was incorporated in Washington on or about August 2, 2002.  Among the trade names formally registered to United National is Post Closing Department.   From about 2002 through 2008, Kelley provided reconveyance tracking services to several escrow companies in Washington State through United National, dba Post Closing Department.

22.     According to United National's original Operating Agreement dated August 2, 2002, Kelley was the LLC's manager and president.  The same Operating

1    Agreement noted that, initially, Blackstone owned 50% of United National. The

2    ownership structure changed over the years. By the end of 2007, United National's

3    Schedule K-1 showed that Blackstone owned approximately 79% of United National.

4    Approximately 18% of United National was owned by an entity called Attorney Trustees

5    Services, which was, in turn, owned by Kelley's wife, and approximately 2.6 % was

6    owned by another entity called Mortgage Lending Inc. Finally, during a sworn

7    deposition taken on August 2, 2010, in connection with a civil suit filed by Old Republic

8    Title Ltd. against Kelley, Kelley testified in effect that when United National closed, he

9    believed Blackstone was United National's sole owner. According to the Washington

10   State Secretary of State's office, United National became inactive in about August of

11   2008.

12          4.     *Overview of real estate transactions and the role of reconveyance tracking*
                   *companies.*
13

14          23.    During the course of this investigation, I reviewed certain transcripts of

15   depositions and legal filings connected with the civil suits filed against escrow companies

16   regarding reconveyance fees. In addition, I participated in interviews or reviewed

17   memoranda of interviews of witnesses who worked in or with escrow companies.

18   Through these sources, I learned the following:

19          24.    In Washington State, those buying a home or refinancing a home through a

20   mortgage typically grant deeds of trust to their lenders. By signing a deed of trust, the

21   borrower "conveys" the property to a trustee to hold it in trust for the lender to secure

22   payment of the loan. When the underlying loan is paid in full, such as through the sale of

23   the property or a subsequent refinancing, the trustee must transfer title to the home back

24   to the borrower. That process is called a "reconveyance." Generally, in order to perfect a

25   reconveyance, the trustee must, first, execute a document reconveying title back to the

26   borrower, and, second, record that document with the relevant county's recording office.

27          25.    Escrow companies provide settlement and escrow services for residential

28   real estate transactions. They are responsible for preparing settlement statements,

1   collecting and disbursing loan funds and sale proceeds, and for ensuring that the pertinent

2   documents are prepared and recorded to facilitate transfer of good title, including

3   reconveyances.  The process of preparing and recording reconveyances, however, has

4   attendant costs.  For example, those who serve as trustees generally receive a service fee

5   to prepare and record the reconveyance.  Recording fees are also paid to county recording

6   offices in order to record the reconveyance.  Escrow companies, therefore, often charge at

7   closing a "reconveyance processing fee" in amounts ranging typically between $100 and

8   $150, sufficient to cover anticipated reconveyance costs.

9        26.     As the sheer volume of real estate transactions rose over the years, some

10   escrow companies outsourced the oversight of the reconveyance process to tracking

11   companies.  The escrow companies typically paid reconveyance tracking firms a tracking

12   fee for each real estate transaction tracked.  The fees paid to reconveyance tracking firms

13   were often included in the total reconveyance processing fee assessed the escrow

14   customer at the time of closing.  In some cases, rather than pay the tracking firm just their

15   fees, escrow companies turned over the entire reconveyance processing fee to the

16   tracking company.  When that happened, it was the reconveyance tracking company's

17   responsibility not only to account for and take its own fees for its services, but also to pay

18   any attendant third-party costs, such as trustee fees and recording fees.  As further

19   detailed below, service agreements between escrow companies and tracking firms often

20   specified that any unused portion of the reconveyance processing fees were to be returned

21   to the original party that had paid the fees.

22        27.     As escrow companies increasingly turned to third-party reconveyance

23   tracking services to monitor reconveyances, separately, many of the major lenders also

24   changed the manner in which they handled reconveyances.  Namely, major lenders began

25   to perform much of the reconveyance process themselves, including preparing and filing

26   the reconveyances, and either included the trustee fees and recording fees in the final loan

27   payoff amount or performed the work for free.  This change meant that much of the

28   reconveyance processing fees charged by escrow companies at closing, including trustee

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

1  fees and recording fees, were duplicative and not necessary.  Consequently, where

2  escrow companies had turned over the entire reconveyance processing fee to a third party

3  reconveyance tracking company, the reconveyance tracking company also no longer

4  needed to pay for trustee services and recording fees out of the lump sum entrusted to it.

5  **B.    From 2002 through 2008, Kelley Provided Reconveyance Tracking**

6  **Services and Accumulated Millions in Reconveyance Processing Fees.**

7       28.    Beginning in or about 2002 and continuing through 2008, Kelley's

8  company, United National, LLC, provided various escrow companies in Washington

9  State reconveyance tracking services under the trade name Post Closing Department or

10  PCD.  Kelley's escrow company clients included Stewart Title of Snohomish County

11  (hereinafter "Stewart"), Fidelity National Title (hereinafter "Fidelity"), and Old Republic

12  Title Company (hereinafter, "Old Republic").

13       29.    <u>Stewart</u>:  During the course of this investigation, IRS Special Agents

14  interviewed Carl Jorgenson.  Jorgenson is a former president of Stewart.  According to

15  Jorgenson, Stewart could have engaged PCD's services as early as 2002.  Jorgenson

16  believed that PCD received about $125 per real estate transaction, of which between $25

17  and $45 was PCD's fee for its tracking services.  The remainder of the amount was

18  provided in case PCD had to pay county recording fees.  However, if a reconveyance fee

19  had already been paid up front, i.e. the lender had already collected the fee, Jorgenson

20  explained that PCD was to take only the agreed upon tracking fee and refund the rest to

21  the seller.  Although Jorgenson stated that there was a written agreement detailing the

22  terms of service, the investigation to date has not recovered a written agreement between

23  Stewart and PCD.  PCD may have ceased providing reconveyance services to Stewart by

24  sometime in 2007.

25       30.    <u>Fidelity</u>:  During the course of this investigation, I reviewed a written

26  "Agreement for Post Closing Services" entered between Julie Yates, Escrow Operations

27  Manager and Vice President, on behalf of Fidelity, and Kelley for PCD.  The agreement

28  was signed by Yates on October 9, 2003.  A copy of the agreement was provided to law

SW Affidavit- 11

1   enforcement by representatives of Fidelity, however the agreement contained only the

2   signature of Yates and did not include a corresponding signature of Kelley.  During an

3   interview with IRS Special Agents, Yates confirmed that this agreement with her

4   signature was the agreement she executed with Kelley on behalf of Fidelity.

5        31.    The agreement between Fidelity and PCD specified that, in return for PCD

6   receiving, tracking and preparing "all reconveyances and satisfaction of mortgages from

7   both escrow and title," Fidelity would pay PCD a $15.00 post closing tracking fee per

8   item.  Yates confirmed that the agreement entitled PCD to a fee of $15.00 per

9   reconveyance.  The agreement further specified that Fidelity would collect and pay over

10  to PCD the reconveyance fee assessed customers, and that expenses "such as trustee fees

11  and recording fees that are associated with a file will be advanced and charged to that

12  file.  At the completion of post closing documentation, if extra funds are left over, PCD

13  shall forward funds to Customer . . . ."  Yates's understanding, consistent with this

14  agreement, was that PCD would receive the entirety of reconveyance fees assessed at

15  closing, including fees for trustee services and recording, and that PCD was responsible

16  for refunding directly to the party that had paid the reconveyance fees any unused funds.

17  Yates stated that Fidelity assessed reconveyance processing fees in the range of $120.00

18  to $150.00 per file, which were then turned over to PCD to administer in accordance with

19  the contract.  PCD stopped performing reconveyance services for Fidelity in 2008.

20       32.    Old Republic:  During the course of this investigation, I have reviewed an

21  "Agreement for Post Closing Services" entered into between Carleton Lago, Senior Vice

22  President and Secretary, on behalf of Old Republic, and Kelley for PCD.  The parties

23  signed the agreement on May 8th and May 4th of 2006, respectively.  Pursuant to the

24  agreement, PCD was to "receive, track, prepare and obtain all reconveyances and

25  satisfaction of mortgages from client's closed escrow and title files" for which Old

26  Republic would pay a "$20.00 post closing tracking fee per item."  The agreement further

27  specified that the "fee includes management of funds due trustees & client refunds" and

28  that PCD would provide Old Republic "with monthly progress reports of reconveyance

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

1    activity on each of client's files being tracked as well as an accounting on all funds

2    received from client that have been disbursed and/or refunded to principals."

3        33.    I reviewed the transcript of deposition testimony of Carleton Lago taken on

4    August 4, 2010, in connection with a civil suit filed by Old Republic against Kelley.

5    During the deposition, Lago was asked about the terms of the agreement entered between

6    PCD and Old Republic.  Mr., Lago testified that, prior to signing the contract, sometime

7    in March or April 2006, he and others from Old Republic met personally with Kelley

8    during which time Lago made clear that Old Republic would pay a flat fee of only $20

9    per reconveyance tracked and that moneys not paid to trustees for recording fees would

10   be returned to the escrow customer.  Lago stated that Kelley assured Old Republic that he

11   understood those terms.  The agreement, therefore, did not provide for anything more

12   than a flat $20 fee for all reconveyance tracking services, and, if funds were not used for

13   third party expenses, PCD was obligated to return remaining funds to the original payor.

14   According to Lago, PCD ceased providing reconveyance services to Old Republic in the

15   summer of 2008.

16       34.    During the course of this investigation I, as well as a forensic accountant

17   and a Special Agent from the Federal Bureau of Investigation, reviewed certain bank

18   accounts opened at Columbia Bank and held in the name of United National.  An analysis

19   of these accounts revealed that generally, United National deposited reconveyance fees

20   received from Stewart, Fidelity, and Old Republic into three separate Columbia accounts

21   established for each escrow company.  Reconveyance fees from Stewart were deposited

22   into Columbia account *8074; Reconveyance fees from Fidelity were deposited into

23   Columbia account *8249; and reconveyance fees from Old Republic were deposited into

24   Columbia account *1629.  On the whole, the analysis showed that fees and refunds for

25   reconveyances associated with a particular escrow company were paid out of the

26   corresponding escrow company account.  In other words, fees and refunds associated

27   with transactions closed by Fidelity were generally paid out of the Fidelity Columbia

28   account *8249, and fees and refunds associated with transactions closed by Old Republic

SW Affidavit- 13

1  were generally paid out of the Old Republic Columbia account *1629.   From time to

2  time, Kelley also transferred sums out of the three separate Columbia client accounts into

3  a fourth Columbia bank account *5529 opened in the name of United National from

4  which it appeared Kelley made general business expenditures, including salaries and

5  distributions to himself.

6        35.    Analysis of deposits into the three Columbia escrow company accounts

7  from January 1, 2006, through 2008 showed that each escrow company provided PCD

8  numerous checks in amounts between $100 and $150, or some multiple of these amounts.

9  These amounts corresponded to the reconveyance processing fees assessed and collected

10  by Stewart, Fidelity and Old Republic at closing and sent to PCD to administer pursuant

11  to their respective service agreements.   Further analysis of the same accounts revealed,

12  however, that during the time period between January 1, 2006, through 2008, PCD issued

13  very few refunds to escrow customers even though many of the files appeared not to have

14  required PCD to pay trustee or recording fees.   As a result, the individual bank accounts

15  that held reconveyance fees from the various escrow companies carried large balances

16  consisting of unpaid trustee and recording fees.

17        36.    For example, an analysis of Columbia account *8249, used to collect

18  Fidelity fees, showed that, between 2006 and 2008, PCD received more than $2.5 million

19  in fees for tracking more than 17,000 items.   However, during that same time period, only

20  approximately 464 checks were written to county recording offices and/or trustees for a

21  total amount of approximately $54,000, but only approximately 25 checks were written to

22  customers for refunds, in a total amount of approximately $4,000.

23        37.    An analysis of the Columbia account used to collect Old Republic fees

24  showed a similar pattern.   Between 2006 and 2008, PCD received more than $1.2 million

25  in fees for tracking more than 7,500 items.   However, during that same time period, only

26  approximately 150 checks were written to county recording offices and/or trustees in a

27  total amount of approximately $21,000, but only approximately 30 checks were written to

28  customers for refunds in a total amount of approximately $6,000.

SW Affidavit- 14

1     38.     An analysis of the Columbia account used to collect Stewart fees also

2 showed a similar pattern.  In 2006, prior to ceasing its services of Stewart, PCD received

3 approximately $300,000 in fees.  During that same time period, there were approximately

4 24 checks written to county recording offices and/or trustees in a total amount of

5 approximately $4,000, but only approximately four checks written to customers for

6 refunds in a total amount of approximately $400.

7     39.     From time to time PCD also appeared to have issued some payments for

8 trustee services, county recording fees, and customer refunds relating to the three escrow

9 companies out of two other business accounts controlled by Kelley.  The total amount of

10 possible such payments is approximately $150,000 for trustee and/or county recording

11 fees, and approximately $9,000 in refunds to customers.

12     40.     In sum, the analysis of the United National related bank accounts believed

13 to have been utilized by Kelley in connection with his reconveyance tracking business

14 appeared to show that from about 2006 through 2008, a major portion of the

15 reconveyance fees entrusted to Kelley by the various escrow companies were retained

16 and not paid out to either trustee, county recording offices, or refunded back to the

17 original escrow customer.  As a result, by June 12, 2008, the Stewart Columbia account

18 *8074 held approximately $532,096; the Fidelity Columbia account *8249 held

19 approximately $2,361,181; and the Old Republic Columbia account *-1629 held

20 approximately $888,950.

21 **C.     As Law Suits Were Filed Against Fidelity and Old Republic, Kelley Ceased**
22         **Business and Transferred Accumulated Reconveyance Fees to a New Entity.**

23     41.     On about May 14, 2008, putative class action lawsuits were filed on behalf

24 of escrow customers in the United States District Court for the Western District of

25 Washington against two of Kelley's escrow company clients: *Cornelius v. Fidelity*

26 *National Title Insurance*, 08-cv-754MJP (W.D.WA) and *McFerrin v. Old Republic Title*,

27 08-cv-5309BHS (W.D.WA).  The complaints in these actions alleged, among other

28 things, that Fidelity and Old Republic were collecting duplicative and unnecessary

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

1   reconveyance fees while knowing that major lenders had already collected such fees
2   elsewhere or were performing the reconveyance at no cost.  In the course of litigation,
3   Fidelity and Old Republic both denied any wrongdoing and further countered that they
4   had turned over the responsibility for administering reconveyance fees, including the
5   responsibility for refunding any unused funds, to third party reconveyance tracking
6   companies, including Kelley's PCD.

7      42.      Approximately a month after the law suits were first lodged, Kelley,
8   through a rapid series of transactions using newly-opened bank accounts, suddenly
9   moved and consolidated the funds remaining in the three Columbia Bank United National
10  accounts that held reconveyance fees from Stewart, Fidelity, and Old Republic.  The
11  following is a chronology of account openings and transfers believed to have been
12  initiated or caused to be initiated by Kelley:

13      •  About June 10, 2008, Kelley opened a new bank account in the name of
14         United National at Wells Fargo Bank, account *3310.

15      •  On about June 12, 2008, Kelley wired a combined total of $3,782, 227,
16         from the three separate Columbia Bank accounts that held fees from
17         Stewart, Fidelity and Old Republic, to the newly opened United National
18         account *3310 at Wells Fargo Bank.

19      •  On about June 12, 2008, Kelley opened yet another new account, this time
20         at U.S. Bank, in the name of United National, account number *7633.

21      •  On about June 13, 2008, Kelley transferred via wire $3,785,667, from the
22         Wells Fargo United National account *3310, to the new U.S. Bank account
23         *7633.

24      •  On about June 17, 2008, Kelley opened a new checking account *6040 at
25         Nevada State Bank, this time in the name of Blackstone.

26      •  On about June 18, 2008, Kelley transferred via wire $3,784,619, from the
27         United National U.S. Bank account *7633 to the Nevada State Bank
28         account *6040, held in the name of Blackstone.

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

- On about June 23, 2008, Kelley transferred $149,870 from Blackstone's Nevada State Bank account *6040, to a Blackstone account opened at Vanguard.

- On about June 23, 2008, according to corporate records from the Secretary of State of Nevada, Kelley formed a new partnership, Berkeley United, LLC. At the time Berkeley United was established, according to its federal tax returns, Blackstone owned 1%. The other 99% was owned by Wellington Trust, a trust domiciled in Belize. Wellington Trust, in turn, was controlled by Kelley and also newly established during 2008.

- On about June 26, 2008, Kelley opened a new Vanguard account *8746 in the name of Berkeley United.

- Finally, on about June 27, 2008, Kelley transferred via wire $3,634,673 from the Blackstone Nevada State Bank account *6040 to the Berkeley United Vanguard account, leaving approximately $15 in the Nevada State Bank account.

**D.  From Tax Years 2008 through 2010, Kelley Did Not Pay Tax On the More than $3 Million in Reconveyance Fees Transferred to Berkeley United.**

43.    On or about March 6, 2009, Kelley signed and caused to be filed the first U.S. return of Partnership Income Form 1065 for Berkeley United, LLC. In contrast to most returns associated with Kelley, this return was not prepared by Kelley but instead was prepared by a paid-preparer. For the tax year 2008, Berkeley United reported a total income of $43,658. This income flowed through to Berkeley United's partners, who, at the time were Blackstone and Wellington Trust. The Berkeley United return, however, did not list as income the more than $3.6 million transferred to its Vanguard account on June 27, 2008. Instead, the Berkeley United tax return included a schedule and a statement that noted that Berkeley United held as an asset and corresponding liability approximately $3.6 million in cash in an "impound holding account."

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

44.     Subsequently, Kelley caused to be prepared and filed, through the same paid preparer, Forms 1065 on behalf of Berkeley United for tax years 2009, 2010 and 2011.  In each of those years, Berkeley United again did not declare the more than $3 million it held in its name as income, and instead, as with tax year 2008, continued to show that it held the sum in an "impound holding account" as an asset and a corresponding liability.

45.     Then, beginning with tax year 2011 and continuing through tax years 2012, and 2013, Blackstone's tax returns included a self-prepared workpaper that purported to detail an "impound account history," including balances remaining in an "impound account" and amounts of "income paid" to Blackstone.  The tax treatment by Blackstone of the amounts paid to Blackstone by Berkeley United from this "impound account" will be discussed in more detail below.

**E.     In 2010, Kelley Testified Under Oath that the Millions Moved to Berkeley United in 2008 Had Been Earned by Post Closing Department for Past Services, But Acknowledged He Had Yet to Pay Tax on the Amount.**

46.     As a result of the class action lawsuits, throughout 2008 and 2009, counsel for both Fidelity and Old Republic sought information and records from Kelley including, among other things, an accounting of what had happened to the millions of dollars of reconveyance processing fees entrusted by them to PCD.  On about December 10, 2009, Old Republic brought a separate suit directly against Kelley.  This case was eventually removed to the United States District Court for the Western District of Washington and captioned *Old Republic v. Kelley, et. al.*, 10-cv-0038JLR.  According to the complaint filed in the case, Old Republic alleged that Kelley had agreed in 2006 to perform reconveyance tracking services for a flat fee of $20.00 per escrow transaction, and to refund all unused reconveyance processing fees to borrowers, but instead had improperly kept the excess reconveyance fees for his own enrichment.

47.     On August 2, 2010, Kelley was deposed under oath by counsel for Old Republic in connection with this litigation.  During the deposition, Kelley denied that he agreed to provide reconveyance services to Old Republic for a single flat fee.  Instead,

SW Affidavit- 18

1    Kelley testified that, in addition to the written service agreement, Old Republic and PCD
2    had an unwritten understanding that PCD would and did charge additional fees above and
3    beyond the $20 "tracking fee" that would, in essence, eat up most if not all of the $140 to
4    $150 reconveyance fees entrusted to PCD from Old Republic.  These additional fees were
5    incurred whenever PCD staff had to do additional work to make sure a reconveyance was
6    recorded, such as perform "additional searches on a file," "contact a lender," "follow-up
7    with a lender," and "search court files."

8         48.    Kelley claimed that this understanding was reached during a meeting with
9    Carl Lago, the representative of Old Republic, prior to signing the written service
10   agreement.  According to Kelley, Lago told him to "work the file."  Kelley interpreted
11   that comment, in light of "standard practice in the industry," as permission to add fees for
12   additional work.  Kelley also testified that this practice of charging additional fees on top
13   of the initial tracking fee was the same for Fidelity and Stewart.  When asked by Old
14   Republic counsel for an estimate of the typical amount of fees earned by PCD on an Old
15   Republic transaction, Kelley responded that "$100.00 per item was possible."  Kelley
16   estimated that, for his other escrow customers, including Stewart and Fidelity, PCD also
17   earned about "$100 or more" per item.

18        49.    Kelley further stated during the deposition that he moved to consolidate the
19   approximately $3.6 million in reconveyance fees that had been accumulating in separate
20   client bank accounts for Stewart, Fidelity, and Old Republic because he was in the
21   process of closing down the Post Closing Department business.  Kelley testified that in
22   June 2008, he had performed a final reconciliation of work done on each of the client
23   accounts and determined that he was entitled to keep the remaining balances as "fees
24   earned" for "services provided."

25        50.    Finally, in response to questions from counsel as to whether Kelley ever
26   intended to pay taxes on the nearly $3.6 million, Kelley testified that while the sums he
27   retained in Berkeley United's Vanguard account had been "earned," the income had not
28   been "realized," and that he would pay taxes on the amount when he was told to by his

SW Affidavit- 19

1   attorney.  When asked by Old Republic counsel when the income was going to be

2   "realized," Kelley responded that he did not know exactly but his understanding was that

3   it would be realized over time.

4   **F.     Beginning in 2011, Kelley Initiated a Scheme to Reduce His Tax Liability on**
5   **the Retained Reconveyance Fees by Deducting False Business Expenses.**

6        *1.     <u>After the law suits were dismissed or settled, Kelley began drawing down</u>*
7           *<u>the reconveyance fees he had taken in 2008 in $245,000 yearly increments.</u>*

8       51.     A review of the relevant court documents revealed that on about September

9   8, 2009, the putative class action suit filed against Old Republic was dismissed, in part,

10   on grounds that no provision of the escrow contract made Old Republic responsible for

11   proper administration of reconveyance fees.  Likewise, on about April 1, 2010, the Court

12   dismissed what remained of the putative class action suit filed against Fidelity.   The

13   Court found that Fidelity had not breached any escrow agreement because Fidelity was

14   not obligated by the escrow agreement with borrowers to ensure that Post Closing

15   Department properly refunded reconveyance fees.  Finally, according to information

16   received from outside counsel for Old Republic, on or about May 3, 2011, Kelley reached

17   a settlement with Old Republic in their direct dispute.  According to the settlement

18   agreement, Kelley agreed to return to Old Republic approximately $1,150,000, which

19   was to be refunded to Old Republic's customers.  On or about May 11, 2011, Kelley wire

20   transferred $1,050,000 out of the Berkeley United Vanguard account *8746 toward the

21   payment of the settlement.

22       52.     After paying the Old Republic settlement, Kelley had remaining

23   approximately $2,581,653 in the Berkeley United Vanguard account.  On about June 3,

24   2011, Kelley wired $245,030 from the Berkeley United Vanguard account *8746 to a

25   Wells Fargo Berkeley United account *7983.  On about June 7, 2011, Kelley wrote a

26   check from the Wells Fargo Berkeley United account *7983 in the amount of $245,000 to

27   Blackstone International and deposited the check into Columbia bank account *8470,

28

SW Affidavit- 20

1    held in the name of Blackstone.  No further withdrawals from the Berkeley Vanguard

2    account were made in 2011.

3         53.    The following year, on about January 6, 2012, Kelley wrote another

4    $245,000 check from the Berkeley Vanguard account *8746 to Blackstone and deposited

5    the check into Blackstone's Columbia account *8470.  Then, on February 1, 2012, Kelley

6    took $2,090,818, which was the vast majority of the remaining balance, from the

7    Berkeley United Vanguard account *8746 and deposited the amount into a Vanguard

8    account *6680 opened in the name of Blackstone.  No further withdrawals were made

9    from the sums deposited into the Blackstone Vanguard account in 2012.  Berkeley United

10   was dissolved sometime in 2012.

11        54.    Finally, on January 3, 2013, Kelley wrote yet another check for $245,000

12   from the Vanguard Blackstone account *6680 to Blackstone and deposited the sum into

13   Blackstone's Columbia account *8470.

14        2.    *For tax years 2011 through 2012, Blackstone declared the $245,000*

15             *transferred from Berkeley United as income and offset the income with*

16             *significant business expenses.*

17        55.    On or about February 28, 2012, Kelley signed under penalty of perjury and

18   filed Form 1120S Income Tax Return for an S Corporation on behalf of Blackstone for

19   the tax year 2011.  The return was not signed by any paid preparer.  As a result, I believe

20   that Kelley prepared the return himself.  The address listed for Blackstone was Kelley's

21   residence located at 2521 Fremont Street, Tacoma, Washington, 98406.

22        56.    On the return, Kelley declared that Blackstone's business consisted of

23   "Information Services" and the product or service that Blackstone offered was

24   "Document Tracking."  Kelley further declared that the company made gross profits of

25   $245,000 for tax year 2011.  The amount declared corresponded to the $245,000 Kelley

26   had disbursed to Blackstone from Berkeley United.  The income assigned to Blackstone,

27   however, was significantly offset by business expense deductions that totaled $66,147.

28   According to an attached Form 4562 (Depreciation and Amortization), approximately

$28,535.32 of the declared expenses consisted of depreciation for two vehicles, including

SW Affidavit- 21

1  a vehicle "placed in service" in 2011. Kelley indicated in Form 4562 that both vehicles
2  were used 100% for the business. In addition, other business deductions were summarily
3  described in a personally prepared workpaper entitled "Profit & Loss Statement," and
4  appended to Blackstone's return. The workpaper noted, for example, $5,162.21 in fuel
5  expenses, $8,830.40 in business travel, $3,065.48 in conference education expenses,
6  $7,402.12 in "sales" expenses, and $2,974.35 for subscriptions and books.

7      57.    On or about February 2, 2013, Kelley signed under penalty of perjury and
8  filed Form 1120S on behalf of Blackstone for the tax year 2012. Kelley continued to
9  declare Blackstone's business as consisting of "Information Services" and the product or
10 service offered as "Document Tracking." Blackstone again declared gross profits of
11 $245,000, corresponding to the $245,000, transferred in January 2012 from Berkeley
12 United to Blackstone. And again, as with Blackstone's 2011 tax return, Blackstone's
13 income in 2012 was significantly offset by business expenses totaling $60,425. Attached
14 to the 2012 Form 1120S was a personally prepared workpaper summarizing various
15 categories of claimed business expenses. The workpaper noted, among other things,
16 $5,953.85 in fuel costs, $12,573.81 in business travel, $4,979.40 in a category entitled
17 "conference education," $9,975.04 in "sales" expenses, and $6,270 in depreciation for a
18 vehicle. On the attached Form 4562 that detailed the depreciated vehicle, Kelley noted
19 that the vehicle claimed was used 100% for business and that the vehicle had been driven
20 15,000 miles during that year.

21      58.    As a result of the business expense deductions claimed on Blackstone's
22 2011 and 2012 tax returns, Kelley reduced Blackstone's ordinary business income for
23 each of those years. Because Blackstone's ordinary business income was reportable on
24 Kelley's personal tax return, Kelley also reduced his own taxable income for each of
25 those years. The overall effect of the claimed expenses was to reduce Kelley's personal
26 tax obligation by approximately $20,000 in each of 2011 and 2012.

27
28

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

3.   _Kelley knowingly claimed false business expenses in 2011 through 2012 to reduce tax._

59.     Pursuant to the Internal Revenue Service, businesses are permitted to deduct "ordinary and necessary" business expenses paid or incurred in the course of the taxpayer's trade or business.

60.     There is probable cause to believe that the tens of thousands of dollars in business expenses claimed in Blackstone's tax returns for each of the tax years 2011 and 2012 were knowingly false and are likely personal expenses incurred in those years or wholly fictitious.  That is because there is evidence that Kelley did not conduct any document tracking business activity in 2011 or 2012 in order to earn the $245,000 of reported income.

61.     First, the $245,000 amounts paid to Blackstone in each of 2011 and 2012 were derived from reconveyance fees that had accumulated back in 2008 in three Columbia bank accounts for Stewart, Fidelity and Old Republic.  In the August 2, 2010, deposition taken in the case of _Old Republic v. Kelley_, Kelley testified under oath that the fees in those accounts were for _past_ services already provided.  In other words, there was nothing further Kelley or his business had to do to earn the money.  The questions and answers from the relevant portion of the transcript were as follows:

Q:   We talked about the 800 or so thousand dollars that you had in Old Republic Title's bank account in June 2008, and how your position is that that was money that you'd earned over the previous two years, correct?
A:   Yes.
Q:   You also pulled out of other accounts at that point in time another approximately $3.3 million?
A:   Yes.
Q:   Was that also for fees that you'd earned in the previous years working for those companies?
A:   Those are for fees earned and services provided, correct.

62.     Second, Kelley consistently listed Blackstone's business address in the company's tax filings as his residence in Tacoma, Washington.  However, there is no

1   evidence that Blackstone ever applied for or received a business license in Washington

2   State, or reported any revenues to the Washington State Department of Revenue,

3   including the $245,000 that, pursuant to the federal tax returns, Blackstone earned in each

4   of 2011 and 2012 by providing "document tracking" services.  Evidence shows that

5   Kelley is well aware of the requirement to obtain requisite business licenses for active

6   businesses and to report to the Department of Revenue.  For example, from 2006 through

7   2008, when United National, a partnership primarily owned by Blackstone, was actively

8   engaged in providing reconveyance tracking services, Kelley duly registered with the

9   Washington State Department of Licensing, and reported its purported revenues to the

10   Washington State Department of Revenue.  All reporting to the Washington State

11   Department of Revenue for United National ceased after 2008 when United National was

12   closed.  There is no evidence, however, that Blackstone obtained a separate business

13   license in Washington State, or opened a separate account with the Department of

14   Revenue to support the notion that it was conducting an active business out of Kelley's

15   Tacoma home.

16        63.    Third, Kelley's required F-1 Reports filed with the PDC and detailed above

17   also appear to contradict the claim that Blackstone in 2011 and 2012 actively conducted a

18   document tracking business.  The F-1 Report is organized in a manner to prompt the

19   filing official to distinguish between sources of income derived from activity, such as

20   employment, from those that are earned more passively, such as through interest

21   payments or earnings from bank accounts, stocks, bonds, and other investment vehicles.

22   The F-1 Reports direct the filer to identify sources of "Income" in Section 1 and

23   "Assets/Investments – Interest/Dividends" in Section 3.

24        64.    Since 2005 and continuing through calendar year 2013, Kelley's F-1

25   Reports consistently listed Blackstone only in Section 3 as simply a company in which he

26   held an ownership interest.  In contrast, for calendar years 2005 through 2008, Kelley's

27   F-1 Reports listed United National both under Section 1, as a source of income from

28   active employment, and in Section 3 as a company in which he held ownership interest.

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

1    Furthermore, as is required by the F-1 Reports, Kelley listed United National's major

2    business customers from whom it received substantial income. This is consistent with the

3    evidence that showed that during this period of time, Kelley was actually providing

4    reconveyance tracking services through United National. However, while Blackstone's

5    federal tax returns for tax years 2011 and 2012 indicated that it earned $245,000 per year

6    providing "document tracking" services, the F-1 Reports for the same years still listed

7    Blackstone only in Section 3 as an asset, and contained no list of any major business

8    customers.

9        65.    Fourth, an analysis of expenditures Kelley made from a known bank

10   account associated with Blackstone was unable to corroborate a number of the categories

11   of business expenses claimed on the 2011 and 2012 Blackstone returns. An FBI forensic

12   accountant reviewed records pertaining to the Columbia Bank account *8470 held in the

13   name of Blackstone. The forensic accountant focused on this account because bank

14   records showed that the $245,000 annual payments from Berkeley United were ultimately

15   deposited into this Blackstone Columbia Bank account.

16       66.    According to the analysis, for tax year 2011, the vast majority of

17   withdrawals from the Blackstone Columbia Bank account *8470 were either disbursed to

18   Kelley personally, used to purchase a vehicle, or used to pay an American Express Credit

19   Card account *92000, issued in the name of Kelley. A further analysis of the American

20   Express Credit Card account *92000 statements for 2011 showed that Kelley used the

21   card to pay for myriad of items such as hotels, restaurants, transportation expenses and

22   some utility bills. While the forensic accountant was able to match dollar for dollar the

23   amounts Kelley claimed for cell phone expenses and other telephone related expenses in

24   Blackstone's 2011 tax return with amounts Kelley paid through his American Express

25   Card account *92000 for such services in 2011, the analysis to date has not been able to

26   identify the source for other claimed categories of expenses. For example, the forensic

27   accountant was unable to match the amounts claimed by Kelley in Blackstone's 2011

28   return for business travel expenses or conference and education expenses through an

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

1   analysis of either the Blackstone Columbia bank account *8470 or the American Express
2   Card account *92000.

3       67.    For tax year 2012, the forensic accountant was able to match amounts paid
4   from the Blackstone Columbia account *8470 to an accountant in 2012 with amounts
5   declared by Kelley in Blackstone's 2012 tax return as an "accounting fee" expense, but,
6   as with tax year 2011, the forensic accountant was not able to match many other
7   categories of declared business expenses.

8       68.    Fifth, major categories of ordinary and necessary business expenses that
9   Kelley claimed during prior tax years when he was actually conducting a "document
10   tracking" business are strangely absent from the 2011 and 2012 returns filed for
11   Blackstone. Instead, Kelley reports through Blackstone significant amounts of expenses
12   for categories that he had not previously deducted in connection with his tracking
13   business. This discrepancy in the types and amounts of expenses claimed between the
14   two periods of time supports the belief that the expenses claimed in 2011 and 2012
15   through Blackstone are not related to any legitimate document tracking business.

16       69.    For example, for tax years 2006 through 2008, when United National LLC,
17   dba as Post Closing Department, was clearly providing tracking services for clients such
18   as Fidelity and Old Republic Title, Kelley claimed in the United National Forms 1065
19   salaries and wage expense deductions of $318,435.65, $339,235.76, and $152,658.48,
20   respectively. In 2011 and 2012, however, when Blackstone was purportedly conducting
21   the same "document tracking" business to earn the same fees, it claimed zero deductions
22   for salaries or wages. Likewise, in United National's Forms 1065 for tax years 2006
23   through 2008, Kelley claimed a combined total of $59,568.50, in rent expenses. In 2011
24   and 2012, however, when Blackstone was purportedly conducting the same business, it
25   reported no rent expenses. Rather than reporting wage and rent expenses, in 2011 and
26   2012, Blackstone claimed deductions for significant amounts related to business travel
27   and travel and entertainment. In tax years 2011 and 2012, Blackstone reported a
28   combined total of $21,404 in business travel expenses and $8,688 in travel and

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

1    entertainment deductions.   In tax years 2006 through 2008, however, when United

2    National was actually conducting document tracking, it did not claim any business travel

3    or travel and entertainment deductions.

4         70.     Sixth, I have reason to believe that the purported expenses claimed in the

5    Blackstone returns for tax years 2011 and 2012 are intended by Kelley to reflect expenses

6    incurred in 2011 and 2012, and do not represent some form of deferred or accrued

7    expenses from past years when he actually operated Post Closing Department.  That is

8    because analysis of the expenses claimed showed that at least for the items that the

9    analysis was able to match with actual expenditures out of a Blackstone bank account, the

10   expense was actually incurred in the tax year reported.  For example, as noted above, a

11   forensic accountant was able to match the dollar amount claimed as cell phone expenses

12   in Blackstone's 2011 tax return with amounts paid through Kelley's American Express

13   Card in 2011 toward a cell phone account.  In addition, the 2011 Blackstone Form 1120S

14   claimed depreciation for a vehicle that Kelley noted in the return itself as having been

15   "placed in service" beginning November 30, 2011.

16        71.     Seventh, in a voluntary interview conducted with IRS Criminal Special

17   Agents, Kelley provided statements regarding how he earned the income declared in

18   Blackstone's tax returns that contradicted earlier testimony.  On about April 19, 2013,

19   after Kelley signed and filed the Blackstone Form 1120S for the tax year 2012, he

20   consented to an interview with Special Agents with the IRS.  During the interview,

21   Kelley was asked to explain his tax treatment of fees he had consolidated in 2008 but did

22   not declare as income.  Among other things, Kelley claimed that, pursuant to certain

23   guidance he had received in years past, he understood that the reconveyance fees should

24   be kept in an impound account and drawn down only when earned, at which point the

25   taxpayer should report the money as income and pay tax on it.  Kelley stated that the

26   reconveyance fees from 2008 were kept in a Blackstone account, and the tax returns

27   showed that they were held in an impound account.  Kelley explained that the money was

28   sitting in an impound account because work on these reconveyances had not been

SW Affidavit- 27

1   completed.  He further stated that each year he or his company did work and moved the

2   money over as it was earned.  Once earned, Kelley stated that he reported the amount on

3   the relevant tax returns.  Kelley emphasized that reconveyances typically take about 10

4   years, and that there were "a whole host of charges that are not done yet."

5        72.    Kelley's explanation that he or his company were conducting further work

6   to earn the reconveyance fees originally taken in 2008 directly contradicted his testimony

7   from the August 2, 2010, deposition during which he confirmed that the fees taken in

8   2008 had fully been earned as a result of past "services provided."   Given that he had

9   testified previously that fees had already been earned, the claim that additional work and,

10  therefore, additional business expenses, were necessary to earn again the same

11  reconveyance fees make little sense.

12       73.    Finally, after Kelley was contacted by the IRS, Blackstone's subsequent tax

13  returns changed and Kelley no longer claimed certain types of business expenses or the

14  amounts he had previously claimed for tax years 2011 and 2012.  Approximately 10

15  months after being contacted by IRS Special Agents, on about February 27, 2014, Kelley

16  signed and filed Blackstone's Form 1120S for the tax year 2013.  This tax return is

17  notable in that, although Blackstone declared the same amount of gross profits as in prior

18  years -- $245,000 -- the business expenses that were necessary to "earn" those fees

19  changed dramatically from prior years.  According to the return, Kelley sold the vehicle

20  previously used for the business and auto related expenses were reduced significantly.

21  Business travel expenses dropped to $3,816, and subscriptions and books, which in the

22  prior year amounted to $2,695.38, dropped to $988.01.  Kelley also no longer declared

23  any depreciation for vehicles or any expenses for conferences and education.

24  **VI.    RELEVANCE OF ITEMS SOUGHT BY WARRANT**

25       74.    As set forth more fully in Attachment B, this affidavit seeks authority to

26  search for and seize evidence of false tax filings for Blackstone International for the tax

27  years 2011 and 2012.  The specific items sought include not only the Blackstone tax

28  returns and all receipts, accounting records, and other documentation that relate to the

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

1   particular tax years under suspicion, but records relating to Blackstone's filings for other
2   tax years from 2006 through 2013. As noted above, for tax years 2006 through 2012,
3   Kelley consistently deducted substantial business expenses for Blackstone, and the types
4   and categories of expenses also remained consistent. The consistency in the pattern of
5   business expenses in 2011 and 2012 with the prior years, however, raises questions given
6   the fact that Blackstone's apparent business in 2011 and 2012, in contrast to the earlier
7   years, was limited to drawing down in $245,000 increments the more than $2 million in
8   tracking fees collected for services already provided. Therefore, tax information and
9   supporting records relating to Blackstone's earlier tax years may be relevant to highlight
10  the contrast in business activity, and provide support for the illegitimacy of business
11  expenses declared in 2011 and 2012. Likewise, Blackstone's tax information and
12  supporting records for tax year 2013, filed after Kelley was made aware of a criminal tax
13  investigation, may serve to shed light on how and why the nature of the declared business
14  expenses for that year, in contrast to the prior years, changed dramatically even though
15  Blackstone drew down the same income as before. Again, the contrast in types and
16  amounts of claimed business expenses between tax year 2013 and the prior years may be
17  relevant to show the illegitimacy of the prior years' claimed business expenses.

18          75.     As set forth more fully in Attachment B, this Affidavit also seeks authority
19  to search for and seize tax information and supporting records related to entities from
20  which Blackstone receives flow through income as a result of an ownership interest,
21  specifically, United National, LLC and Berkeley United, LLC. As detailed above, the
22  profits and losses from the operation of United National and Berkeley United ultimately
23  flow through and become part of Blackstone's tax returns. Information related to those
24  entities are relevant because a complete and correct understanding of Blackstone's
25  returns and the information presented in those returns require an understanding of how
26  the profits and losses, including business expenses, for those separate entities were
27  calculated and accounted for.
28

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

76.     Finally, this affidavit also seeks authority to search for and seize computers and other electronic storage media, further defined below, for electronically maintained tax return information and supporting records pertaining to Blackstone for tax years 2006 through 2013. I believe that computers and electronic storage media are relevant because with each of Blackstone's tax returns, Kelley appended what appears to be computer-generated workpapers, schedules, or spreadsheets that summarized the business expenses claimed in each of Blackstone's returns. In addition, the Blackstone tax returns themselves appeared to have been generated electronically via a computer since the information on the forms are typed and not handwritten. There is probable cause to believe, therefore, that computers and electronic storage media in Kelley's residence may contain electronic accounting software and electronic files with tax return information, schedules, spreadsheets, or accounting ledgers from which Kelley generated the returns and the schedules appended to the returns. The protocol to be followed for identifying, seizing and searching the relevant computer and electronic storage media is set forth separately below.

## VII.   PROBABLE CAUSE TO BELIEVE THE ITEMS SOUGHT MAY BE FOUND AT KELLEY'S RESIDENCE

77.     I know that Kelley resides at 2521 Fremont Street in Tacoma, Washington. Kelley has used that address as his address on his personal tax returns every year since at least 2006. In addition, he provided that address to IRS Special Agents as his address when he was interviewed by them on April 19, 2013. A search of Washington State Department of Licensing revealed that Kelley's current driver's license lists the Fremont street address as his residence.

78.     In addition, to the extent that it actually operates, Blackstone appears to operate out of 2521 Fremont Street and records pertaining to the entity are likely to be found there. There is no evidence that Kelley maintains a separate business office for Blackstone. For example, from 2006 through 2013, Blackstone has never deducted expenses associated with rent or a lease for property. In every filing or record that I have

SW Affidavit- 30

1   been able to review that was associated with Blackstone, Kelley has listed the Fremont

2   Street address.  In every full F-1 Report filed with the Public Disclosure Commission,

3   Kelley listed Blackstone's address as 2521 Fremont Street.  Blackstone's corporate

4   registration information with the Nevada Secretary of State notes Kelley as the only

5   officer and director and lists the 2521 Fremont Street address as his address of contact.

6   The address of record for the Blackstone Columbia Bank account *8470 is the 2521

7   Fremont Street address.  Therefore, I have reason to believe that business records

8   associated with Blackstone will be maintained at 2521 Fremont Street in Tacoma,

9   Washington.

10        79.    In particular, I believe that Blackstone's tax records will be located at 2521

11   Fremont Street.  Blackstone has listed that address on each of its tax returns from at least

12   2006 through 2013.  In addition, that address was the return address listed on the

13   envelopes in which Kelley mailed Blackstone's tax returns to the IRS for each of the

14   years 2006 through 2013.

15        80.    I also know from this investigation that Kelley has maintained either

16   personal or business tax returns relating to his businesses at his residence at 2521

17   Fremont Street.  During the 2008-10 litigation, Troy Kelley's attorney sent a letter to

18   opposing counsel stating that Kelley had certain tax returns at his home office.  During a

19   2010 deposition, Kelley was asked whether that was true, and stated that it was true.

20        81.    I also know that taxpayers are required to maintain tax records for at least

21   three years.  In addition, I know from my training and experience that individuals often

22   maintain important financial records such as tax records and associated accounting

23   records for even longer.  In this case, I seek authority to search for and seize all tax

24   returns, return information, receipts and other accounting records pertaining to

25   Blackstone that support the calculation of Blackstone's income and business expenses for

26   the tax years 2006 through 2013.  As explained above, Blackstone was a significant

27   source of income for Kelley for many years.  Given the magnitude and the significance of

28   the income provided by Blackstone, I believe there is probable cause to believe Kelley

SW Affidavit- 31

1 maintains records relating to at least the latter (as he is required to do), and, likely, all of,

2 these years at his home.

## VIII.  PROTOCOL FOR SEARCH OF
## RESIDENCE WITH FILTER TEAM

5     82.    I am aware that Kelley is currently represented by counsel in connection

6 with this criminal investigation.  As a result, there may be attorney-client privileged

7 material among the records sought by this application for a warrant.  In order to prevent

8 inadvertent exposure to such material by those involved in this investigation, the search

9 of Kelley's home and the initial seizure of the authorized records, computer and digital

10 devices will be wholly conducted by IRS Special Agents from the Criminal Division

11 who, after the search and seizure, will have no further role in the investigation of this

12 matter, other than to establish chain of custody and, if needed, to provide information

13 and/or testimony regarding the conduct of this search and seizure.  The search and seizure

14 team will be advised as to the identities of all relevant counsel and will be instructed to

15 avoid review of any material that may constitute attorney-client communication or

16 attorney work product, never communicate to members of the investigative team the

17 contents of such suspected privileged material, and seize only material authorized by this

18 warrant.

## IX.    SEARCH AND SEIZURE OF
## COMPUTERS AND FORENSIC ANALYSIS

21 **A.    Definition of Terms.**

22     83.    Based on my training and experience and the training and experience of

23 other agents who are involved in and work with the forensic analysis of electronic

24 devices, I use the following terms to convey the following meanings:

25         a.    Computer:  The term "computer" includes all types of electronic,

26 magnetic, optical, electrochemical, or other high speed data processing devices

27 performing logical, arithmetic, or storage functions, including desktop computers,

28 notebook computers, mobile phones, tablets, server computers, and network hardware.

UNITED STATES ATTORNEY
700 Stewart Street, Suite 5220
Seattle, Washington 98101
(206) 553-7970

1      b.      Electronic storage medium:  The term "electronic storage medium"

2  includes any physical object upon which computer data can be recorded.  Examples

3  include hard disks, RAM, floppy disks, flash memory, CD-ROMs, and other magnetic or

4  optical media.

5      84.    I will refer to computers and electronic storage media collectively as

6  "computers" throughout this Affidavit.

7  **B.      Prior Efforts to Obtain Evidence**

8      85.    No prior search warrant has been obtained for the residence and computers

9  of Troy Kelley.  On about April 19, 2013, Kelley, as the representative of the entities,

10  was served subpoenas for United National, Blackstone, Berkeley United, and Wellington

11  Trust, among others, for corporate records, accounting records, and bank records for

12  years 2005 through 2013.  Counsel for Kelley subsequently expressed objections to the

13  subpoena, and the subpoenas were withdrawn in deference to potential privilege and self-

14  incrimination issues.  As a result, no records were obtained pursuant to the subpoena.

15  The warrant I apply for today would allow for the seizure of some but not all of the

16  information called for by those prior subpoenas.

17  **C.      Probable Cause That Electronic Records Exist on Computers at Residence.**

18      86.    As described in Attachment B, this application seeks permission to seize

19  computers in order to facilitate a later authorized search of the relevant computers for

20  electronically stored records pursuant to Fec. R. Crim. P. 41(e)(2)(B).  In addition to the

21  probable cause set forth above, there is probable cause that the records sought will be

22  stored on the computers for the following reasons:

23      a.      Based on my knowledge, training, and experience and the

24  knowledge, training and experience of those within IRS who specialize in computer

25  forensics, I know that computer files or remnants of such files can be recovered months

26  or even years after they have been downloaded onto a device, deleted, or viewed via the

27  Internet.  Electronic files downloaded to a device can be stored for years at little or no

28  cost.  Even when files have been deleted, they can be recovered months or years later

SW Affidavit- 33

1  using forensic tools.  This is so because when a person "deletes" a file on a device, the

2  data contained in the file does not actually disappear; rather, that data remains on the

3  device until it is overwritten by new data.

4          b.      Therefore, deleted files, or remnants of deleted files, may reside in

5  free space or slack space-that is, in space on the device that is not currently being used by

6  an active file-for long periods of time before they are overwritten.  In addition, a

7  computer's operating system may also keep a record of deleted data in a "swap" or

8  "recovery" file.

9          c.      Wholly apart from user-generated files, computer storage media-in

10  particular, computers' internal hard drives-contain electronic evidence of how a computer

11  has been used, what it has been used for, and who has used it.  To give a few examples,

12  this forensic evidence can take the form of operating system configurations, artifacts

13  from operating system or application operation, file system data structures, and virtual

14  memory "swap" or paging files.  Computer users typically do not erase or delete this

15  evidence, because special software is typically required for that task.  However, it is

16  technically possible to delete this information.

17          d.      Similarly, files that have been viewed via the Internet are sometimes

18  automatically downloaded into a temporary Internet directory or "cache."

19  **D.      Necessity of Imaging or Seizing the Entire Computer.**

20          87.      In most cases, a thorough search of a premises for information that might

21  be stored on a device often requires the seizure of the physical computers and later off-

22  site review consistent with the warrant.  In lieu of removing the computers from the

23  premises, it is sometimes possible to make an image copy of the computers.  Generally

24  speaking, imaging is the taking of a complete electronic picture of the device's data,

25  including all hidden sectors and deleted files.  Either seizure or imaging is often

26  necessary to ensure the accuracy and completeness of data recorded on the device, and to

27  prevent the loss of the data either from accidental or intentional destruction.  This is true

28  because of the following:

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

1          a.     *The time required for an examination*. As noted above, not all
2    evidence takes the form of documents and files that can be easily viewed on site.
3    Analyzing evidence of how a device has been used, what it has been used for, and who
4    has used it requires considerable time, and taking that much time on premises could be
5    unreasonable. As explained above, because the warrant calls for forensic electronic
6    evidence, it is exceedingly likely that it will be necessary to thoroughly examine a device
7    to obtain evidence.  Computers and electronic storage media can store a large volume of
8    information.  Reviewing that information for things described in the warrant can take
9    weeks or months, depending on the volume of data stored, and would be impractical and
10   invasive to attempt on-site.

11          b.     *Technical requirements*.  Computers and electronic storage media
12   can be configured in several different ways, featuring a variety of different operating
13   systems, application software, and configurations.  Therefore, searching them sometimes
14   requires tools or knowledge that might not be present on the search site.  The vast array
15   of computer hardware and software available makes it difficult to know before a search
16   what tools or knowledge will be required to analyze the system and its data on the
17   Premises.  However, taking the device off-site and reviewing it in a controlled
18   environment will allow its examination with the proper tools and knowledge.

19          c.     *Variety of forms of electronic media*.  Records sought under this
20   warrant could be stored in a variety of storage media formats that may require off-site
21   reviewing with specialized forensic tools.

22   **E.     Search and Seizure Protocols.**

23          88.    In accordance with the information in this Affidavit, law enforcement
24   personnel will execute the search for and seizure of computers pursuant to this warrant as
25   follows:

26          a.     I have reason to believe that Kelley lives at the subject residence
27   with his spouse and two minor children.  It is possible that the subject residence will
28   contain computers that are predominantly used, and perhaps owned, by persons who are

SW Affidavit- 35

1   not suspected of a crime.  If the team conducting the search find multiple computers in

2   the residence, they will attempt to corroborate, on site, which resident(s) have access to

3   each computer.  The search team conducting the search will only seize computers for

4   which there is probable cause that the things described in Attachment B to this warrant

5   will be found.  As to those computers for which the search team has probable cause to

6   believe will contain the things described in Attachment B and are seized in accord with

7   the Affidavit, this application further seeks authority to conduct a preliminary review of

8   the contents of such computers to determine the user.  Law enforcement will then seek a

9   supplemental search warrant if agents believe there is probable cause to support further

10  search of any of those computers and no further search of any computer will be

11  conducted until authorized by a separate warrant.  Those computers that are determined

12  not to be used by Kelley will be immediately returned and no further search of the

13  computer will be made.

14          b.      I also recognize that the seizure of computers may be disruptive to

15  Kelley and others in his residence.  As with any search warrant, I expect that this warrant

16  will be executed reasonably.  Reasonable execution will likely involve conducting an

17  investigation on the scene of what computers are relevant to this investigation.  Where

18  appropriate, officers will make every effort to copy data on-site, rather than physically

19  seize computers to reduce the extent of the disruption.  Upon securing the search site, the

20  search team will conduct an initial review of any relevant computers to determine

21  whether the data contained therein can be duplicated on site in a reasonable amount of

22  time and without jeopardizing the ability to accurately preserve the data.

23          c.      If, based on their training and experience, and the resources

24  available to them at the search site, the search team determines it is not practical to make

25  an on-site copy of the data within a reasonable amount of time and without jeopardizing

26  the ability to accurately preserve the data, then the computers will be seized and

27  transported to an appropriate law enforcement laboratory for review and to be

28  forensically copied ("imaged"), as appropriate.

SW Affidavit- 36

1          d.       In order to examine the seized computers in a forensically sound

2 manner, law enforcement personnel with appropriate expertise will produce a complete

3 forensic image, if possible and appropriate, of any computers that may contain data or

4 items that fall within the scope of Attachment B of this Affidavit.

5        89.      In order to search for data that falls within the list of items to be seized

6 pursuant to Attachment B to this Affidavit, law enforcement personnel will further search

7 for and seize the following items, subject to the procedures set forth above:

8          a.       Any documentation, operating logs and reference manuals regarding

9 the operation of the digital device, or software;

10          b.       Any application, utility programs, compilers, interpreters, and other

11 software used to facilitate direct or indirect communication with the device hardware, or

12 computer to be searched;

13          c.       Any physical keys, encryption devices, dongles and similar physical

14 items that are necessary to gain access to the computers or data; and

15          d.       Any passwords, password files, test keys, encryption codes or other

16 information necessary to access the computers or data.

17        **X. REQUEST FOR NONDISCLOSURE AND SEALING.**

18        90.      It is respectfully requested that this Court issue an order sealing, until

19 further order of the Court, all papers submitted in support of this application, including

20 the application and search warrants. I believe that sealing these documents is necessary

21 because the items and information to be seized are relevant to an ongoing investigation.

22 Premature disclosure of the contents of this affidavit and related documents may have a

23 significant and negative impact on the continuing investigation and may severely

24 jeopardize its effectiveness.

25

26

27

28

SW Affidavit- 37

## XI.  CONCLUSION

91.      For the reasons set forth above, there is probable cause to believe that evidence, fruits and/or instrumentalities of False Tax Filing, in violation of Title 26, United States Code, Section 7206(1), are located at 2521 Fremont Street, Tacoma, Washington 98406, as more fully described in Attachment A to this Affidavit.  I therefore request that the court issue a warrant authorizing a search of the Subject Residence for the items more fully described in Attachment B hereto, incorporated herein by reference, and the seizure of any such items found therein.

*Aaron Hopper*

AARON HOPPER, Affiant
Special Agent,
Internal Revenue Service


SUBSCRIBED and SWORN to before me this ___*1 3rd*___ day of March, 2015.

*J. Richard Creatura*

J. RICHARD CREATURA
United States Magistrate Judge

SW Affidavit- 38

## ATTACHMENT A

### Premises to be Searched

The subject premises is located at **2521 Fremont St, Tacoma, Washington, 98406**. It is a two story residence with an attached garage. The residence is clearly marked 2521 with diagonal numbers in between garage doors. The residence is a beige color with white garage doors, a white front door, and some white trim. Part of the residence contains rock siding and there is a rock chimney coming out of the roof of the residence. The top level of the residence contains a balcony. There are steps next to the driveway leading up to the front door of the residence. Below is a photograph of the subject residence.



1          **ATTACHMENT B**

2   **I.    Items to be Seized.**

3          This warrant authorizes the government to search for and seize the following

4   records, documents, files, or materials, in whatever form, including handmade or

5   mechanical form (such as printed, written, handwritten, or typed documents);

6   photocopies or other photographic form; and electrical, electronic, and magnetic form

7   (such as tapes, cassettes, hard disks, floppy disks, diskettes, compact discs, CD-ROMs,

8   optical discs, zip cartridges, printer buffer, smart cards, electronic notebooks, or any other

9   storage medium), that constitutes evidence, instrumentalities and/or fruits of the

10  commission of False Tax Filing, in violation of Title 26, United States Code, Section

11  7206(1), which may be found at the subject premises:

12          1.     For tax years 2006 through 2013, all federal tax forms and accompanying

13  schedules, whether filed or unfiled, prepared in the name of Blackstone International, Inc.

14  (EIN 94-3378360);

15          2.     For tax years 2006 through 2013, all federal tax forms and accompanying

16  schedules that support the federal tax returns prepared for Blackstone International, Inc.,

17  including forms and schedules relating to any separate corporate or partnership entities

18  whose profit or loss ultimately flows through and appears on Blackstone International,

19  Inc.'s tax returns, including schedules and federal tax forms prepared in the name of

20  Berkeley United, LLC, and United National, LLC;

21          3.     For tax years 2006 through 2013, all bookkeeping records and other

22  financial records (including, sales logs, trial balances, general ledgers, general journals,

23  subsidiary ledgers and journals, disbursement records and/or journals, accounts payable

24  ledgers and records, payroll records, loans receivable and payable ledgers, cash receipts

25  and/or disbursement journals, and work papers) relating to Blackstone International, Inc.,

26  Berkeley United, LLC, and United National, LLC, that may have been used to prepare

27  the tax forms and accompanying schedules for such entities, and which may contain

28  evidence of and amounts of business expenditures for such entities;

Attachment B/SW- 1

4.      For tax years 2006 through 2013, all contracts, agreements, invoices, bills, receipts, loan documents, leases, rental agreements, engagement letters, business proposals, business advertisements, and client lists that evidence business activity for Blackstone International, Inc.;

5.      Types of digital devices to be seized and searched in accordance with the procedures set forth in the attached Affidavit include "computers" and "electronic storage medium." The term "computer" includes all types of electronic, magnetic, optical, electrochemical, or other high speed data processing devices performing logical, arithmetic, or storage functions, including desktop computers, notebook computers, mobile phones, tablets, server computers, and network hardware. The term "electronic storage medium" includes any physical object upon which computer data can be recorded. Examples include hard disks, RAM, floppy disks, flash memory, CD-ROMs, and other magnetic or optical media.

6.      For any computer and electronic storage medium (collectively referred to hereinafter as "COMPUTER") whose seizure is authorized by this warrant, this warrant further authorizes the seizure of the following:

a.      evidence of who used, owned, or controlled the Computer at the time the things described in this warrant were created, edited, or deleted, such as logs, registry entries, configuration files, saved usernames and passwords, documents, browsing history, user profiles, email, email contacts, "chat," instant messaging logs, photographs, and correspondence;

b.      evidence of software that would allow others to control the Computer, such as viruses, Trojan horses, and other forms of malicious software, as well as evidence of the presence or absence of security software designed to detect malicious software;

c.      evidence of the lack of such malicious software;

d.      evidence of the attachment to the Computer of other storage devices or similar containers for electronic evidence;

Attachment B/SW- 2

1            e.      evidence of counter-forensic programs (and associated data) that are

2 designed to eliminate data from the Computer;

3            f.      evidence of the times the Computer was used;

4            g.      passwords, encryption keys, and other access devices that may be

5 necessary to access the Computer;

6            h.      documentation and manuals that may be necessary to access the

7 Computer or to conduct a forensic examination of the Computer;

8            i.      contextual information necessary to understand the evidence

9 described in this attachment.

10 **II.**      **Search Protocol**

11      Law enforcement personnel will execute the search of computers seized pursuant

12 to this warrant as follows:

13            a.      In executing this warrant, where appropriate, officers will make every effort

14 to copy data on-site, rather than physically seize computers to reduce the extent of the

15 disruption.  Upon securing the search site, the search team will conduct an initial review

16 of any relevant computers to determine whether the data contained therein can be

17 searched and/or duplicated on site in a reasonable amount of time and without

18 jeopardizing the ability to accurately preserve the data.

19            b.      If, based on their training and experience, and the resources available to

20 them at the search site, the search team determines it is not practical to make an on-site

21 search, or to make an on-site copy of the data within a reasonable amount of time and

22 without jeopardizing the ability to accurately preserve the data, then the computers will

23 be seized and transported to an appropriate law enforcement laboratory for review and to

24 be forensically copied ("imaged"), as appropriate.

25            c.      It is further possible that the subject residence will contain computers that

26 are predominantly used, and perhaps owned, by persons who are not suspected of a

27 crime.  If the team conducting the search find multiple computers in the residence, they

28 will attempt to corroborate, on site, which resident(s) have access to each computer.  The

Attachment B/SW- 3

1   search team conducting the search will only seize computers for which there is probable

2   cause that the things described in Attachment B to this warrant will be found.  As to those

3   computers for which the search team has probable cause to believe will contain the things

4   described in Attachment B and are seized in accord with this warrant, this application

5   further authorizes the search team to conduct a preliminary review of the contents of such

6   computers to determine the user.  Law enforcement will then seek a supplemental search

7   warrant if agents believe there is probable cause to support further search of any of those

8   computers and no further search of any computer will be conducted until authorized by a

9   separate warrant.  Those computers that are determined not to be used by Kelley will be

10  immediately returned and no further search of the computer will be made.

11          d.      In order to examine the seized computers in a forensically sound

12  manner, law enforcement personnel with appropriate expertise will produce a complete

13  forensic image, if possible and appropriate, of any computers that is found to contain data

14  or items that fall within the scope of Attachment B of this Affidavit.  In addition,

15  appropriately trained personnel may search for and attempt to recover deleted, hidden, or

16  encrypted data to determine whether the data fall within the list of items to be seized

17  pursuant to the warrant.  In order to search fully for the items identified in the warrant,

18  law enforcement personnel, which may include investigative agents, may then examine

19  all of the data contained in the forensic image/s and/or on the digital devices to view their

20  precise contents and determine whether the data fall within the list of items to be seized

21  pursuant to the warrant.

22          e.      The search techniques that will be used will be only those

23  methodologies, techniques and protocols as may reasonably be expected to find, identify,

24  segregate and/or duplicate the items authorized to be seized pursuant to Attachment B to

25  this Affidavit.

26          f.      If, after conducting its examination, law enforcement personnel

27  determine that any computer is an instrumentality of the criminal offenses referenced

28  above, the government may retain that device during the pendency of the case as

Attachment B/SW- 4

1  necessary to, among other things, preserve the instrumentality evidence for trial, ensure

2  the chain of custody, and litigate the issue of forfeiture.  If law enforcement personnel

3  determine that a computer was not an instrumentality of the criminal offenses referenced

4  above, it shall be returned to the person/entity from whom it was seized within 90 days of

5  the issuance of the warrant, unless the government seeks and obtains authorization from

6  the court for its retention.

7

8  THE SEIZURE OF DIGITAL DEVICES OR OTHER ELECTRONIC STORAGE
9  MEDIA AND/OR THEIR COMPONENTS AS SET FORTH HEREIN IS
   SPECIFICALLY AUTHORIZED BY THIS SEARCH WARRANT, NOT ONLY TO
10 THE EXTENT THAT SUCH DIGITAL DEVICES OR OTHER ELECTRONIC
   STORAGE MEDIA CONSTITUTE INSTRUMENTALITIES OF THE CRIMINAL
11 ACTIVITY DESCRIBED ABOVE, BUT ALSO FOR THE PURPOSE OF THE
12 CONDUCTING OF OFF-SITE EXAMINATIONS FOR THEIR CONTENTS FOR
   EVIDENCE, INSTRUMENTALITIES, OR FRUITS OF THE AFOREMENTIONED
13 CRIMES.

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

Attachment B/SW- 5